## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AMERICAN FREEDOM LAW ) | |
| CENTER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 14-1143 (RBW) |
| ) | |
| BARACK OBAMA, in his official ) | |
| Capacity as President of the United ) | |
| States, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

### MEMORANDUM OPINION

Plaintiffs American Freedom Law Center and Robert Muise bring this civil action against the United States Departments of Health and Human Services, Treasury, and Labor, as well as a number of government officials in their official capacities, alleging violations of the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) (2012), regarding the defendants' implementation of certain provisions of the Patient Protection and Affordable Care Act ("the Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010). Complaint ("Compl.") ¶¶ 10–19, 52–74. Specifically, the plaintiffs challenge the federal government's "transitional policy" and "hardship exemption," which permit individuals temporarily to maintain health insurance coverage through plans not compliant with the general requirements of the Act. Id. ¶¶ 34–37. The plaintiffs have moved for a preliminary injunction "to enjoin the executive actions of the [defendants] that unlawfully revise the clear statutory terms of the [Act]." [Plaintiffs'] Notice of Motion and Motion for Preliminary Injunction ("Pls.' Mot. for Inj.") at 1. The defendants oppose the motion, Defendants' Memorandum of Points and

1

Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs.' Opp'n to Inj.") at 3, and have moved to dismiss this matter in its entirety for lack of jurisdiction on standing grounds, Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss ("Defs.' Mem. to Dismiss") at 1.

The Court conducted a hearing on November 5, 2014, to address the parties' pending motions. Subsequent to this hearing, but prior to the Court's resolution of the motions, the plaintiffs requested the opportunity to engage in additional briefing on the issue of their standing. The Court permitted the supplemental briefing, see ECF No. 19, at 3, and the parties have now had thorough opportunity to present their positions on the matter, see generally Am. Inst. of Certified Pub. Accountants v. IRS, No. 14-cv-1190 (JEB), 2014 WL 5585334, at *3 (D.D.C. Oct. 27, 2014) (explaining that the Court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority" (internal quotation marks and citation omitted)). Upon careful consideration of the parties' motions and memoranda of law, the Court concludes that it must grant the defendants' motion to dismiss, and deny as moot the plaintiff's motion for a preliminary injunction.[1]

## I. BACKGROUND

The Affordable Care Act imposes in certain circumstances a "penalty" on those individuals who fail to "maintain minimum essential coverage." See 26 U.S.C. § 5000A (2012). To meet this obligation, individuals must maintain health insurance coverage through an eligible

---

[1] In addition to the documents previously referenced, the Court considered the following submissions in reaching its decision: (1) the Defendants' Motion to Dismiss ("Defs.' Mot. to Dismiss"); (2) the Plaintiffs' Response to Defendants' Motion to Dismiss ("Pls.' Opp'n to Dismiss"); (3) the Defendants' Reply in Support of Motion to Dismiss ("Defs.' Reply to Dismiss"); (4) the plaintiffs' Memorandum of Points and Authorities in Further Support of Plaintiffs' Standing ("Pls.' Supp. Opp'n"); (5) the Defendants' Response to Plaintiffs' Sur-Reply to Defendants' Motion to Dismiss ("Pls.' Supp. Reply"); (6) the plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction ("Pls.' Mem. for Inj."); and (7) the Plaintiffs' Reply in Support of Motion for Preliminary Injunction ("Pls.' Reply for Inj.").

plan, see id., and the minimum standards for such coverage are set forth in the Act, see Defs.'

Opp'n to Inj. at 3.  According to the plaintiffs, "a majority of group health plans . . . lost their

grandfather status [under the Act] by the end of 2013," Compl. ¶ 29, and "millions of Americans

received notices that their health insurance was cancelled," id. ¶ 31, because their plans were no

longer compliant with the Act's requirements, see id. ¶ 34.  In response to this dilemma, the

plaintiffs assert that the defendants implemented "a 'transitional policy' that would allow . . .

millions of Americans whose insurance companies cancelled their health care coverage to remain

in their non-compliant plans," id. ¶ 34.  On March 5, 2014, the defendants extended this

transitional policy until October 2016.  Id. ¶¶ 38–39.

     Also challenged by the plaintiffs is "another directive . . . which is separate from the . . .

'transition policy,' [and] provides further exemption from the penalty for not having health

insurance."  Id. ¶ 37.  This directive, implemented by the Department of Health and Human

Services, provides a "hardship exemption" for individuals who "have been notified that [their]

policy will not be renewed."  Id. (internal quotation marks omitted).  These individuals may

apply for "catastrophic coverage" if "the plan options available in the [m]arketplace in [their]

area are more expensive than [their] cancelled health insurance polic[ies]."  Id. (internal

quotation marks omitted).

     Plaintiff Muise is Co-Founder and Senior Counsel of co-plaintiff American Freedom Law

Center, id. ¶ 12, which is a nonprofit organization with the mission "to fight for faith and

freedom through litigation," id. ¶ 11 (internal quotation marks omitted).  Muise is a resident of

Michigan, and "receives health insurance for himself and his family through [American Freedom

Law Center]."  Id. ¶ 12. Following the Act's implementation, the plaintiffs' insurer, Blue Cross

Blue Shield of Michigan ("Blue Cross"), informed the plaintiffs by letter that their "current plan

[was] changing and [it would] be transitioning [the plaintiffs] into a reform-compliant plan."

Pls.' Mot. for Inj., Exhibit ("Ex.") E (Blue Cross Letter) at 1.  Blue Cross further noted in the

letter that it "responded to the new government mandates by creating an entire portfolio of health

plan options that are both comprehensive and compliant with federal requirements" and that the

plaintiffs may "select a plan from [Blue Cross's] whole new menu of options."  Id.

While American Freedom Law Center expresses its "desire and intention to abide by

federal law as validly passed," Compl. ¶ 45, and to "provide[] its employees with health

insurance that is compliant with the [Act] as passed by Congress and signed into law by

President," the plaintiffs nonetheless lament the cost of doing so, id. ¶ 44.  Prior to the plaintiffs'

transition to an Act-compliant plan, they claim that Muise's monthly health insurance premiums

were $1,349.96, of which Muise contributed $600 and American Freedom Law Center

contributed the remaining amount.  Pls.' Mem. for Inj. at 10.  Under their new plan, the plaintiffs

claim that the monthly premiums "will increase to $2,121.59," which represents a "[fifty-seven]

percent cost increase."  Id. at 11.

The plaintiffs suggest that this rise is due, in part, to the defendants' transitional policy

and hardship exemption.  They argue that

> as the pool of "applicable individuals" who are required to purchase "minimum
> essential coverage" pursuant to the unambiguous language of the Affordable Care
> Act is reduced, as [the defendants] ha[ve] done through [the hardship exemption
> and transitional policy], the direct effect of this action is to financially burden those
> who do maintain "minimum essential coverage" pursuant to the Act, specifically
> including [the] [p]laintiffs, who are now suffering an economic injury directly
> related to [the] [d]efendants' unlawful actions.

Compl. ¶ 46.  In other words, the plaintiffs contend that "Michigan is a state in which the 'health

insurance risk pool' has been narrowed" due to the challenged policies, "thereby increasing

(rather than reducing) 'administrative costs' and 'health insurance premiums.'"  Pls.' Mot. for

Inj., Ex. 1 (Declaration of Robert J. Muise), ¶ 31.  And they posit that these assertions are supported by "undisputed congressional findings (and fundamental economic principles)."  Pls.' Opp'n to Dismiss at 3.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1).  When a defendant moves to dismiss under Rule 12(b)(1), "the plaintiff[] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject[-]matter jurisdiction."  Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [a] plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).  However, because the plaintiff has the burden of establishing the Court's jurisdiction, a "court must give [a] plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim."  Byrum v. Winter, 783 F. Supp. 2d 117, 122 (D.D.C. 2011) (citing Macharia v. United States, 334 F.3d 61, 64, 69 (D.C. Cir. 2003)).

"Although 'the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject[-]matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) on the complaint standing alone,' 'where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'"  Coal. for Underground Expansion v. Mineta, 333

F.3d 193, 198 (D.C. Cir. 2003) (quoting Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C.

Cir. 1992)).  Thus, "the district court may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharm., Inc. v.

FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### III.   ANALYSIS

As a preliminary matter, the Court must "begin . . . with the question of subject matter

jurisdiction" before turning to the merits of a preliminary injunction.  Aamer v. Obama, 742 F.3d

1023, 1028 (D.C. Cir. 2014); see also Zukerberg v. D.C. Bd. of Elections & Ethics, 999 F. Supp.

2d 79, 82 (D.D.C. 2013) ("Before the Court may consider [preliminary injunction] factors, it

must first determine whether it has jurisdiction to hear the case because Article III jurisdiction is

always an antecedent question." (internal quotation marks and citation omitted)).  Indeed, the

Court "need not delve into [a plaintiff's] myriad constitutional and statutory claims [where] the

[plaintiff] lacks Article III standing . . . ."  Crow Creek Sioux Tribe v. Brownlee, 331 F.3d 912,

915 (D.C. Cir. 2003) (concluding that the plaintiff's lack of standing precluded the Court's

review of the merits of a preliminary injunction).  This is because a court may not "resolve

contested questions of law when its jurisdiction is in doubt," Steel Co. v. Citizens for a Better

Env't, 523 U.S. 83, 101 (1998), as "[h]ypothetical jurisdiction produces nothing more than a

hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by

[the Supreme] Court from the beginning," id.

Courts have "always insisted on strict compliance with this jurisdictional standing

requirement . . . [a]nd [this Court's] standing inquiry [must be] especially rigorous when

reaching the merits of the dispute would force [this Court] to decide whether an action taken by

one of the other two branches of the Federal Government was unconstitutional."  Raines v. Byrd,

521 U.S. 811, 819–20 (1997) (citations omitted).  The irreducible constitutional minimum of standing contains three elements: (1) injury in fact; (2) causation; and (3) the possibility of redress by a favorable decision.  Lujan, 504 U.S. at 560–61.  The plaintiff bears the burden of establishing each of these elements, id., and "[s]ince these elements 'are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof,'" Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv., 933 F. Supp. 2d 58, 68 (D.D.C. 2013) (quoting Lujan, 504 U.S. at 561).  Moreover, the plaintiff must demonstrate standing with respect to each claim and form of relief sought.  See Monsanto Co. v. Geerston Seed Farms, 561 U.S. 139, 153 (2010).  "In analyzing whether [a plaintiff] has standing at the dismissal stage," the Court must "assume that [the plaintiff] states a valid legal claim and 'must accept the factual allegations in the complaint as true.'"  Info. Handling Servs., Inc. v. Def. Automated Printing Servs., 338 F.3d 1024, 1029 (D.C. Cir. 2003) (citations omitted) (quoting Sturm, Ruger & Co. v. Chao, 300 F.3d 867, 871 (D.C. Cir. 2002)).

Yet where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed," Lujan, 504 U.S at 562, and "it becomes 'substantially more difficult' to establish standing," Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting Lujan, 504 U.S. at 562).  "In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction," and "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'"  Lujan, 504 U.S. at 562 (quoting

ASARCO Inc. v. Kadish, 490 U.S. 605, 615 (1989)).  Thus, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury," Nat'l Wrestling Coaches, 366 F.3d at 938 (internal quotation marks omitted), and "mere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice to invoke the federal judicial power,'" id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 44 (1976).  Particularly relevant here is this Circuit's observation that "[t]he greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 670 (D.C. Cir. 1996).

The standard is not insurmountable, and this Circuit recognizes that there are "some cases [that] have held that plaintiffs have standing to challenge government action on the basis of injuries caused by regulated third parties where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." Nat'l Wrestling Coaches, 366 F.3d at 941. For example, this Circuit found that the manufacturer of PVC plastic components established standing to challenge the government's decision to characterize a chemical found in its product as a carcinogen, where the "plaintiff introduced affidavits and other record evidence demonstrating that municipalities and health care organizations opted to phase out their use of PVC plastic as a direct result of the . . . decision" and because of the "pejorative and damaging" nature of the carcinogen label. Id. (explaining Tozzi v. U.S. Dep't of Health & Human Servs., 271 F.3d 301, 307–10 (D.C. Cir. 2001)).  Similarly, this Circuit "held that a film distributor had standing to challenge a decision by the government to classify as 'political propaganda' certain films that the plaintiff wished to distribute," where the distributor "submitted several declarations

8

and affidavits detailing specific instances in which potential customers declined to take the films because of the classification."  Id. at 941–42 (explaining Block v. Meese, 793 F.2d 1303, 1308–309 (D.C. Cir. 1986)).

Upon review of the plaintiffs' submissions in support of standing in this case, it is evident that they have fallen woefully short of meeting their burden.  As the defendants aptly note, "health insurance premiums fluctuate for myriad reasons, ranging from the particular terms of coverage to various other actuarial factors."  Defs.' Mem. to Dismiss at 15.  Furthermore, as correctly noted by the defendants,

> [the] [p]laintiffs have not established any of the links in the causal chain . . . that would be necessary to their apparent theory of standing to challenge this particular exemption.  [The] [p]laintiffs have not alleged, for example, that there are individuals in Michigan with cancelled policies; that any such individuals consider the other policies available to them to be unaffordable; that any such individuals have availed themselves of [the defendants'] "hardship" exemption for consumers with cancelled policies; that, but for this exemption, any such individual would have purchased "minimum essential coverage" . . . ; that in purchasing such coverage, that individual would have entered the same risk pool as these [p]laintiffs; and that such individual's addition to the risk pool would have lowered [the] [p]laintiffs' premiums.

Id. at 20 (citation omitted).  As with the hardship exemption, the plaintiffs have similarly failed to submit evidence to establish a causal connection between the transitional policy and the increase in their premiums.  Indeed, "[m]ost, if not all, of the individual links in the chain alleged by [the plaintiffs] depend on some allegation that cannot be easily described as true or false," and courts "routinely refuse to permit such predictive assumptions to establish standing."  Fla. Audubon Soc'y, 94 F.3d at 670.  Tozzi and Block "require 'formidable evidence' of causation," Nat'l Wrestling Coaches, 366 F.3d at 942 (quoting Freedom Republicans, Inc. v. FEC, 13 F.3d 412, 418 (D.C. Cir. 1994)), and as the plaintiffs' submissions here lack any such factual foundation akin to that submitted in those cases, the Complaint "plainly falls far short of the mark," id. (citations omitted); see also W. Dairymen Co-op., Inc. v. Yeutter, No. 90-cv-0220

(RCL), 1990 WL 547032, at *4 (D.D.C. Apr. 10, 1990) ("The Court of Appeals for the District

of Columbia Circuit has made clear that a plaintiff cannot obtain standing merely by

hypothesizing a series of events which, if they occurred, would harm [the] plaintiff.").

   In opposing the defendant's motion to dismiss, the plaintiffs cite General Motors Corp. v.

Tracy, 519 U.S. 278 (1997), as controlling.  In General Motors, the Supreme Court addressed the

constitutionality of an Ohio law that imposed "taxes on natural gas purchases from all sellers,

whether in-state or out-of-state, except regulated public utilities that me[t] Ohio's statutory

definition of a natural gas company."  519 U.S. at 281–82 (internal quotation marks omitted).

The Supreme Court held that while General Motors was not a seller subject to interstate

discrimination, it had standing to raise a Commerce Clause challenge to the law because

"customers of that class may also be injured, as in this case where the customer is liable for

payment of the tax and as a result presumably pays more for the gas it gets from out-of-state

producers and marketers."  Id. at 286.  The plaintiffs' reliance on General Motors is misplaced,

however, as the case is merely a reiteration of the causation standard articulated above; the

Supreme Court identified a clear causal connection between the law and the harm – "Ohio levied

a [five percent] tax on . . . natural gas," id. at 282, the plaintiff "bought virtually all the natural

gas for its Ohio plants from out-of-state marketers," id. at 285, and thus was injured by virtue of

being "liable for payment of the tax," id. at 286.  The plaintiffs here have not provided evidence

sufficient to establish a similar causal connection between the government action and the alleged

harm.

   The plaintiffs rely also on language in the Act reflecting what they characterize as

"undisputed congressional findings ([grounded on] fundamental economic principles)."  Pls.'

Opp'n to Dismiss at 3.  They argue that these Congressional findings support their position that

"unlawfully reducing the 'health insurance risk pool' by illegally exempting certain individuals (and their health care plans)" imposes "increased financial costs and burdens to [the] [p]laintiffs (and others) who must remain in the 'pool.'" Id.  Specifically, the plaintiffs assert that invalidating the use of the hardship exemption and transitional policy would "'broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums,' and 'significantly increas[e] health insurance coverage and the size of purchasing pools, which will increase economies of scale . . . .'" Id. at 22–23.  But this Circuit has rejected such sweeping analytic "assertions," and requires "actual evidence" concerning "the future actions of third-party market participants . . . ." Crete Carrier Corp. v. EPA, 363 F.3d 490, 494 (D.C. Cir. 2004).  For example, in Crete Carrier, large-haul truck operators challenged the Environment Protection Agency's diesel engine emissions standards, alleging that they suffered from "increased prices for tractors with engines meeting the . . . emissions limit . . . ." Id. at 492.  This Circuit found that the truck operators lacked standing, noting that they

> offer[ed] only assertions, not facts, to support their claims about the likely response of engine manufacturers to repeal of the [emissions standard].  That will not do.  Speculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient to establish Article III standing.  Without actual evidence of how engine manufacturers would respond to relaxation or rescission of the [emissions standard] – and the Trucking Companies have proffered none – we can not "wade into this morass of marketplace analys[i]s," and emerge with the conclusion the engine manufacturers would revert to producing pre-[emissions standard] engines.

Id. at 494 (citations omitted).  Similarly, the plaintiffs here have failed to offer any actual evidence that supports their "fundamental economic principles," see Pls.' Opp'n to Dismiss at 3, and without such a factual basis, the Court may not accept the plaintiffs' assertions as sufficient to establish standing.

The plaintiffs posit that if the Court declines to accept their marketplace analysis as truth, the resulting holding would necessitate the conclusion that the Act's "entire regulatory scheme is

pointless."  Pls.' Supp. Opp'n at 6 (emphasis omitted).  However, this Circuit has rejected this reasoning in analogous circumstances, explaining that "one need not adopt the view that a challenged government policy is totally ineffectual to find that the likelihood of redress is too speculative to confer standing upon a plaintiff."  Nat'l Wrestling Coaches, 366 F.3d at 943.  Accordingly, this argument does not absolve the plaintiffs of their failure to submit actual evidence demonstrating causation and redressability.  See id.

The plaintiffs contend also that their marketplace analysis is supported by specific Congressional findings in the Act.  Pls.' Opp'n to Dismiss at 3.  But again, this Circuit has held that such arguments do not remedy a plaintiff's evidentiary failures with respect to standing, reasoning that "[w]e do not defer to the views of . . . Congress or its individual members in determining whether a particular rule will cause injury to a particular plaintiff or as proof of any causal chain necessary for standing."  Fla. Audubon Soc'y, 94 F.3d at 670 (quoting The Freedom Republicans, 13 F.3d at 417).

The plaintiffs' arguments in their supplemental brief fare no better.  The supplemental filing largely relies on a June 6, 2014 Actuarial Memorandum published by Blue Cross for its 2015 small group market rate submission.  Pls.' Supp. Opp'n, Ex. A (Blue Cross 2015 Small Group Rate Filing) at 1.  In that publication, Blue Cross proposed a "rate change of 2.7% for 2015 for all small group products that were offered in 2014."  Id. at 7.  Listed among the four "[s]ignificant drivers of the rate change" was Blue Cross's observation of "[l]ower than anticipated improvement of the [Act] compliant market level risk pool in 2014 and 2015 due to the market being allowed to extend pre-[Act] non-grandfathered plans into 2016."  Id.

As a preliminary matter, the Court observes that the 2.7% rate increase is apparently the average change across all small group plans; for the eighteen plans described in the filing, some

of the premiums experienced an increase of up to 3.3%, but some experienced no change in premiums, and some even experienced a decrease depending on the quarter in which the plan is renewed.  See id. at 8.  The plaintiffs having failed to specify which plan they have elected to join, the Court would have to engage in pure speculation to conclude that they are members of one of the plans that experienced an increase in premiums due to the "significant driver" noted in the Memorandum, as opposed to a plan that experienced no increase or a decrease of their premiums.[2]

But even if the plaintiffs claimed that they were members of a plan that experienced an increase in premiums from the prior year, the Actuarial Memorandum suffers from the same speculative deficiencies as the plaintiffs' Complaint.  It amounts to mere assertions by the insurance company and does not constitute evidence that would permit the Court to conclude that, but for the hardship exemption and transitional policy, individuals in Michigan would necessarily elect to join the specific Blue Cross plan in which the plaintiffs are currently enrolled.  Indeed, "the presence and number of third-party links in this causal chain independently corroborate that [the plaintiffs'] claim of causation is 'entirely speculative' and insufficient for standing."  Fla. Audubon Soc'y, 94 F.3d at 670 (citation omitted).  More importantly, the Actuarial Memorandum does not establish that Blue Cross will necessarily reduce their premiums in the future even if this Court invalidated the government's policy

---

[2] The plaintiffs represent that their monthly premiums rose from $1,349.96 to $2,121.59 during this time period—an increase of approximately fifty-seven percent, Pls.' Opp'n to Dismiss at 13, but do not address Blue Cross's explanation that the plaintiffs' former insurance plan is "changing" and that they will be moved to a plan compliant with the requirements of the Act, see Pls.' Mot. for Inj., Ex. E (Blue Cross Letter) at 1 ("Your current plan is changing and we will be transitioning you into a reform-compliant plan.").  Thus, the Court questions whether the plaintiffs have even alleged a particularized and concrete harm.  The two plans are plainly different—one is Act-compliant and one is not—and the plaintiffs have not demonstrated to the Court that the increased premiums they now pay do not provide concomitant value through improved benefits and services.  Nevertheless, the Court need not reach the merits of this matter because it ultimately concludes that the plaintiffs have not established the remaining elements of standing—causation and redressability.

challenges.  And the lack of such evidence of redressability is ultimately fatal to the plaintiffs'

assertions of standing.  See, e.g., Nat'l Chicken Council v. EPA, 687 F.3d 393, 396 (D.C. Cir.

2012) (concluding that plaintiff chicken farmers who challenged an EPA decision that allegedly

resulted in an increase in the production of corn-based transportation fuel, and in turn, an

increase in the cost of corn that the farmers use as feed, "can only meet their burden of proof on

the redressability element of standing if they set forth specific facts in the form of an affidavit or

other evidence which show a substantial probability that vacatur of [EPA's interpretation] would

cause corn prices to [fall]"); Nat'l Wrestling Coaches, 366 F.3d at 944 (plaintiffs "failed

completely to satisfy the redressability prong of Article III standing, for there is nothing to

support [their] claim that a favorable ruling would alter the [third parties'] conduct"); Crete

Carrier, 363 F.3d at 494 (plaintiffs failed to establish standing "[w]ithout actual evidence of how

[the regulated third-parties] would respond to relaxation or rescission of the [government's

allegedly unlawful activity]").

   As a final point, the Court notes that other district courts have arrived at similar

conclusions.  For example, in Peterson v. United States, the District of New Hampshire

concluded that the plaintiff's alleged harm—that the Act "has caused his supplemental private

health insurance premiums to rise"—lacked redressability and therefore was insufficient to

confer standing.  774 F. Supp. 2d 418, 424 (D.N.H. 2011).  The District of New Hampshire

reasoned that the plaintiff's "supplemental insurer is not a party to this case, so a judgment in

[his] favor would not require it to rescind or reduce the premium increases."  Id.  The Court

found that the plaintiff had not "alleged sufficient facts, relating either to his Medicare benefits

or his supplemental private health insurance premiums, to give him standing to challenge the

manner in which the Act was passed."  Id. at 425.  Thus, the Court concluded that the plaintiff

was "merely speculating about how a third party might respond if the Act is struck down as unconstitutional." Id. at 424.  Similarly, in Butler v. Obama, the Eastern District of New York declined to find standing where the plaintiff alleged that portions of the Act resulted in increased insurance premiums because he "altogether failed to allege an injury and causation that are not entirely conclusory in nature."  814 F. Supp. 2d 230, 240 (E.D.N.Y. 2011).  According to the Eastern District of New York,

> any conclusory assertion by [the] plaintiff in the instant case about current premiums and the individual mandate—namely, that the individual mandate is causing insurance premiums to increase for certain types of insurance he wishes to purchase—is insufficient to establish standing where the setting of such premiums involves the independent decisions of insurance companies in response to a whole variety of potential factors—including the statutory and regulatory framework, as well as general market conditions.  Therefore, [the] plaintiff has no standing based upon any alleged increases in insurance premiums arising from the passage of the Act.

Id. at 241–42.  The Court finds these decisions to be of sound reasoning and consistent with the precedent of this Circuit and the Supreme Court.  The Court therefore deems there to be no reason to deviate from them.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiffs lack standing to challenge the allegedly unlawful activity in this case.  Accordingly, the Court must grant the defendants' motion to dismiss.  As the plaintiffs lack standing to bring their asserted claims, the Court must also deny as moot the plaintiffs' motion for a preliminary injunction.

**SO ORDERED** this 15th day of May, 2015.[3]

REGGIE B. WALTON
United States District Judge

---

[3] An Order consistent with this Memorandum Opinion shall be issued contemporaneously.